UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN ALANIZ, | Case No. 17-03569 BLF (PR) |
| Petitioner, | |
| | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |
| v. | |
| SCOTT FRAUENHEIM, Warden, | |
| Respondent. | |

Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2014 criminal judgment. Respondent filed an answer on the merits. Dkt. No. 18. Petitioner has filed a traverse and a request to file a supplemental letter. Dkt. Nos. 22, 23. The request to file a supplemental letter is granted. For the reasons set forth below, the petition is **DENIED**.

## I. BACKGROUND

On September 5, 2014, a jury convicted Petitioner of: (1) first degree murder of Ricky Jacques, *see* Cal. Penal Code § 187, and (2) active participation in a criminal street

gang, *see* Cal. Penal Code § 186.22(a). Dkt. No. 18-10 at 139, 142. The jury also found true an enhancement for the personal discharge of a firearm causing great bodily injury or death, *see* Cal. Penal Code § 12022.53(d), and an enhancement for committing the crime for the benefit of a criminal street gang, *see* Cal. Penal Code § 186.22(b)(1)(C). *Id.* at 140-41. On October 31, 2014, the Court stayed the sentence on the gang conviction and dismissed the gang enhancement. *Id.* at 149-51. The Court sentenced Petitioner to an aggregate term of 50 years to life in state prison. *Id.*

On October 4, 2016, the California Court of Appeal affirmed the judgment. Dkt. No. 18-18 at 30-76. On December 21, 2016, the California Supreme Court denied a petition for review. *Id.* at 229.

Petitioner filed the instant habeas petition on June 21, 2017. Dkt. No. 1.

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the California Court of Appeal on direct appeal:

### A. The Shooting of Ricky Jacques

#### 1. Testimony of Noe Acevedo

Ricky Jacques and Noe Acevedo were long-time friends. Acevedo was an associate of a Norteño gang subset, the McLaughlin Park Gang (MPG), which had controlled McLaughlin Park at one point. Jacques was also a Norteño associate.

On May 16, 2012, Jacques drove over to Acevedo's house. Acevedo had been drinking beer, and Jacques appeared to be high. They both drank alcohol and became inebriated. Jacques tended to become hostile when he was drunk.

Jacques and Acevedo drove past McLaughlin Park. Jacques pointed out two guys "that he had problems with" in the past, and he "flip[ped] them off." Jacques and Acevedo then went to Jacques's house, where they smoked cigarettes and listened to music. Later, they drove back to McLaughlin Park. Jacques parked and got out of the car, carrying a

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

2

baseball bat. Acevedo found a tire iron in the back of the car and followed Jacques into the park. He heard Jacques say something like "F you" to a person sitting in the park. He also heard the person curse back at Jacques and saw Jacques raise the bat over his head.

Acevedo then saw a group of people jumping over a fence. As Acevedo and Jacques began running away, the group pursued them. Acevedo ran towards Clemence Avenue, and Jacques ran towards an apartment complex. While being chased, Acevedo heard people in the group call out "sur trece," a Sureño gang reference.

The group caught up to Acevedo and surrounded him. Acevedo took a fighting stance, with the tire iron in his hands, and then blacked out. When Acevedo woke up, he was bleeding. He saw someone in the street in a crouching stance, holding a gun, then he heard three gun shots. Acevedo threw the tire iron into the back of a truck and went home. He realized he had been stabbed in the throat, forehead, and face. He went to the hospital, where his lacerations were stitched up.

### 2. Testimony of Adriana Orozco and Enrique Valdez

On the evening of May 16, 2012, Adriana Orozco and her boyfriend, Enrique Valdez, were together at McLaughlin Street Park. At the time, the park was controlled by two Sureño gangs, Colonias (VCT) and Varrio Tami Lee Gangsters (VTG). Both Orozco and Valdez associated with members of those gangs. About 10 Sureño gang members, including defendant, were nearby.

Orozco and Valdez saw two people running towards them. One person had a bat in his hands, and the other person held a black object that appeared to be a gun, but was in fact a tire iron. As the people approached to within about 20 feet, they asked Valdez if he was a "scrap," meaning a Sureño. They used the phrase "scrap mother fucker" and asked Valdez "if he banged." Valdez said, "No." The two people responded, "Fuck you. Yeah, you do."

The two people continued to approach, and when they were about nine or 10 feet away, Valdez began running towards McLaughlin Avenue. Valdez fell down when he reached a grassy area. He got up but fell down again, then covered his head, expecting to be hit.

Meanwhile, Orozco whistled, which got the attention of the Sureño group gathered nearby. Members of that group, including defendant, came over a fence and ran towards the two individuals who had chased Valdez. The Sureños were saying things like, "Ayy, fucking busters. Get out of here." When the two individuals saw the Sureño group coming, they ran towards Clemence Avenue, saying, "Oh, shit. Let's get out of here."

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

3

Defendant and other members of the Sureño group ran after the two individuals. Orozco and Valdez heard gunshots, then saw some members of the Sureño group return. Someone said that "somebody had been shot."

### 3. Testimony of Mariano Huerta

Mariano Huerta was a VTG member at the time of the McLaughlin Park incident, but he was not present when Jacques was shot, and by the time of trial, he had left the gang. Huerta had been arrested following an unrelated homicide, and he ended up being a witness in that case and providing information about this case.

At the time of the McLauglin Park incident, other VTG members included Savage, Scrappy (defendant), Silencer, Spider, Grumpy or Little Grumpy, Droopy, and Travieso. The VTG gang members often hung out with VCT gang members.

Huerta explained that VTG was a "southerner set" and that "southerners" affiliate with the colors blue, gray, and white, whereas "northerners" affiliate with the color red. Southerners also affiliate with the number 13. Huerta had a tattoo of three dots, which was gang-related, as well as a tattoo of "TG," which stood for "Tami Lee Gangsters." He also had a tattoo reading, "RIP Menace," which referred to a VTG gang member who had been shot and killed by Norteños on April 28, 2012.

After the McLaughlin Park incident, Huerta spoke with defendant. Defendant admitted he had killed Jacques. Defendant referred to Jacques as a "chapete," which is a disrespectful name for northerners. Defendant described how Jacques and Acevedo had chased Valdez, and how he and the other Sureños had then chased Jacques and Acevedo. Defendant did not mention anything about Jacques swinging a bat at anyone.

After defendant was arrested, he called Huerta. He told Huerta that the gun used in the Jacques shooting had been destroyed: defendant and two others had taken it apart and gotten rid of each part. One of the people involved in destroying the gun was Victor Rodriguez, known as Silencer, who was the shot caller of the VTG gang. During the phone conversation, defendant told Huerta that he had obtained another gun to replace the destroyed gun, and that he had hidden the new gun before his arrest.

Huerta explained that gang members need a gun to defend themselves if the rival gang retaliates. Huerta had made efforts to get firearms for the gang after Menace had been killed. He explained that gang members think about retaliating when a fellow gang member dies. After Menace died, the VTG gang had been having meetings about defending themselves and their territory. Defendant was present at the meetings.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

4

### 4. Testimony of Miguel Ramirez

Miguel Ramirez, nicknamed Little Demon, was a VTG gang member at the time of the McLaughlin Park incident and was present when Jacques was shot. He testified at defendant's trial under an agreement with the prosecution. Ramirez had pleaded guilty to assault with a deadly weapon on Acevedo, and he had admitted a gang enhancement. He had been sentenced to a three-year prison term.

According to Ramirez, members of the VTG gang often congregated at the park or at an apartment complex next to the park. The VTG gang members were always on alert for Northerners.

On the day of the shooting, Ramirez was hanging out at the apartment complex with about 10 other gang members. Ramirez, who was armed with a knife, went for a walk in the park with a fellow gang member. Jacques threw a shooting sign at them as he drove by. Ramirez then went back to the group hanging out at the apartments.

A short time later, Ramirez saw Valdez being chased by Jacques and Acevedo. He saw Valdez fall, and he saw Jacques and Acevedo hold up weapons as if they were going to start beating Valdez. Ramirez and the other VTG gang members jumped the fence to the park. Jacques and Acevedo started running, and the VTG gang members chased them out of the park. During the chase, Ramirez heard Jacques tell Acevedo, who was falling behind, to "[k]eep up." Acevedo said, "I can't. I can't." Acevedo stopped and began swinging the tire iron at Ramirez and some of the other gang members. Acevedo was stabbed several times.

Ramirez saw Jacques come running back towards Acevedo, swinging the bat or holding it up. As Jacques came back, defendant shot him. Jacques fell down after the first shot, but he got back up, then reached down and held his thigh or lower back. About five seconds after the first shot, defendant shot Jacques again. Jacques was about 30 feet away from the group of VTG gang members, and defendant was about 20 to 23 feet away from Jacques.

After the shooting, the VTG gang members ran. Ramirez later encountered two fellow gang members who had been involved in the incident: Savage and Little Grumpy. At some point afterwards, Little Grumpy stated, "This is for Menace."

Ramirez believed Jacques and Acevedo still posed a threat even as they were running away, since they could have turned around and hit him with their weapons. He considered Acevedo a threat even after Acevedo fell down, since Acevedo still had a weapon. In addition, Ramirez feared Jacques and Acevedo would come back and do "something" after they reached their car.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

5

### 5. Testimony of Juan Carlos Ramos Castillo

Juan Carlos Ramos Castillo was affiliated with VTG and VCT at the time of the McLaughlin Park incident, but he was not present during the incident. At the time of defendant's trial, Castillo was facing charges of attempted murder, with a firearm use allegation and a gang allegation. The charges stemmed from a drive-by shooting. Castillo had agreed to testify at defendant's trial pursuant to a "proffer" and hoped to have his charges or sentence reduced.

At some point after the McLaughlin Park incident, Castillo was arrested and put into a cell with defendant. While they were in custody together, defendant told Castillo about "some Norteños going into the park" and trying to beat up Valdez. Defendant said he had chased the Norteños out of the park and shot one of them three times. Defendant specified that after the first shot, he had seen the person fall down. The person got back up, and defendant shot him again. Defendant said he needed to shoot the person because the Norteños had attacked Valdez and defendant "was the one with the gun." According to Castillo, if defendant had done nothing, defendant would "look bad" and lose the respect of the other gang members.

Defendant also told Castillo about another incident. Defendant had been a passenger in a car that was pulled over for going too slow. Two other Sureño gang members, from a subset called Sureños Por Vida (SPV) had also been in the car. An officer had started to do a pat-search and felt a gun in defendant's pocket. Defendant had run away, jumping a fence and going into a creek, and he had hidden the gun in a garbage can in someone's back yard.

### 6. Investigation

San Jose Police Officer Robert Forrester responded to the scene of the McLaughlin Park shooting to collect evidence. He found three nine-millimeter shell casings near the curb on Clemence Avenue. He also found a baseball bat and a lug nut tool. There was a bullet strike mark on a nearby building, and a nearby truck had damage from spent projectiles and bullet strikes.

An autopsy of Jacques revealed a gunshot wound to his chest, which was a mortal wound, and a gunshot wound to his thigh. The gunshot had likely entered the back of his thigh and exited the front of his thigh. Jacques also had some blunt force injuries. Jacques's blood had a 0.13 percent blood alcohol content, and he tested positive for marijuana. Acevedo's blood had a 0.19 percent blood alcohol content.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

6

## B. Gang Expert

San Jose Police Detective Kenneth Rak testified as an expert in criminal street gangs.

Sureño gangs have some common signs and symbols, including the color blue and the number 13. They are rivals of Norteños, who identify with the color red and the number 14. VTG and VCT are Sureño subsets whose members often hang out together. The primary activities of VTG and Sureño gangs generally are murders, attempted murders, assaults with deadly weapons, drive-by shootings, stabbings, and felony vandalisms.

According to Detective Rak, "Respect is the number one thing that gang members want, and it's also synonymous with fear." Gang members typically get respect by committing violent acts against rivals and everyday citizens. As a result of gang members committing acts of violence against everyday citizens, such citizens are less likely to call the police, due to fear of retaliation. When Sureños commit a violent act, they often yell out "Trece" (the number 13) or "Sur" (south) or the name of their gang subset. Sureño gang members also use different whistles to communicate: for instance, they may whistle to let other gang members know when the police are coming.

When a rival gang disrespects or challenges gang members, each gang member is expected to "step up" and take on the rivals. If a rival gang member walks through an area that another gang controls, the gang in control of the area will look bad if nothing is done, and the gang will "cease to be" in that area. Gang members are expected to "back one another up" and will be disciplined if they do not.

Some gangs entrust the gang's guns to one gang member. If a gang's gun is used in a crime, it benefits the gang to conceal the weapon from police. When defendant was arrested, he had the following gang-related tattoos: one dot on his right elbow and three dots on his left elbow; and the letters "SJ" on his left hand. Detective Rak testified that, based on his research, several other Sureño gang members were involved in the McLaughlin Park incident: Eduardo Magana, Eric Hernandez, Jaime Ruiz, Carlos Zamora, and Ramon Ramirez. [FN2]

> FN2. The trial court took judicial notice of the following pleas: Zamora, Ramirez, and Ruiz pleaded to assault with a deadly weapon with a gang enhancement; Hernandez pleaded to being an accessory after the fact with a gang enhancement; and Magana pleaded to being an accessory after the fact.

Detective Rak described a number of defendant's prior gang-related contacts with law enforcement. On August 7, 2012, defendant was in a vehicle with two other Sureño gang members. The vehicle was stopped

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

7

and defendant was pat-searched, but defendant ran away after officers felt a gun in his pocket. Defendant was later found and arrested, but a gun was not located. On June 13, 2011, police responded to a report of gang members drinking alcohol in Olinder Park. Five Sureño gang members were contacted, including defendant, and two were arrested for possessing illegal firearms. On July 7, 2009, defendant was contacted with respect to a suspicious vehicle: he was in a car that had a blue bandanna hanging from a mirror. Defendant denied being a Sureño gang member but admitted associating with Sureño gang members. The incident occurred next to McLaughlin Park. On February 5, 2009, defendant was contacted after a vehicle stop. He was wearing a blue sweatshirt and had a blue bandanna. He was in the company of two other Sureño gang members, and he stated that he had "claim[ed] sur since the age of 13." On January 30, 2011, defendant was contacted in the apartment complex adjacent to McLaughlin Park. He was in the company of five other Sureño gang members, he was wearing a blue shirt and had a blue bandanna, and he admitted to being a Sureño gang member. In May of 2007, defendant was contacted in the same area after an officer responded to a trespassing call. Defendant admitted to "kicking it with [VTG]," and he was with Jose Diaz, who was the perpetrator of a subsequent gang-related stabbing. In April of 2007, defendant was contacted regarding another trespassing call, and defendant admitted to "hanging out with VTG." Finally, on another occasion, defendant and another Sureño gang member were contacted in Mountain View after a gang-related incident. During that contact, defendant admitted he and his companion had picked up some Sureño gang members and driven them to the area.

Detective Rak opined that defendant was a Sureño gang member and an active participant. He cited defendant's numerous contacts and self-admissions, and the fact that defendant was "around people carrying weapons" and "around incidents where people are getting hurt and stuff like that."

Detective Rak further opined that the Jacques shooting was committed for the benefit of and in association with the Sureño street gang. He cited the fact that the victims had initially assaulted two Sureño associates, the fact that a group of Sureños had responded, the fact that the responding Sureños had shouted out "Colonias Trece" as they chased and then assaulted the victims.

Detective Rak was given a hypothetical situation in which a VTG gang member was shot and killed by Norteño gang members, after which VTG gang members were meeting. Detective Rak would anticipate that the VTG gang members would "look for revenge," likely by committing a violent assault. If the VTG gang members knew who had committed the shooting, they would try to go after that person or someone else in that person's subset. However, if two Norteño gang members came into a park and assaulted a VTG associate, those people would be targets for that revenge.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

8

A VTG gang member observing such an assault by two Norteño gang members would be obligated to go help the VTG associates. Even if the two Norteño gang members ran away, the VTG gang members would continue to pursue the two Norteño gang members until they were caught. If the VTG gang members were to just "let it go," their gang would be perceived as weak. If the group of VTG gang members included the gang's gun holder, that person would be expected to use the gun.

To show a "pattern of criminal gang activity" (§ 186.22, subds. (a), (e), (f)), Detective Rak testified about prior offenses committed by Sureño gang members in San Jose, and the trial court took judicial notice of the records of conviction.

The first prior offense involved Luis Martinez. On January 7, 2012, two officers driving an undercover vehicle noticed a group of Sureño gang members, including Martinez, on the street. The Sureño gang members threw gang signs, and Martinez pointed a firearm at the officers' vehicle. Martinez was arrested and pleaded to assault with a deadly weapon with a gang enhancement.

A second prior offense involved Roberto Martinez. On October 23, 2011, Martinez stabbed a Norteño gang member in the chest, killing him. Afterwards, Martinez admitted he was a Sureño gang member and said he "had a hate for Norteño gang members" because his brother-in-law had been killed by Norteño gang members. Martinez was convicted of murder with a gang enhancement.

A third prior offense involved Jose Diaz. Detective Rak was the investigator on that case, in which Diaz committed a gang-related stabbing. Diaz was convicted of attempted murder with a gang enhancement.

**C. Defense Case**

Anne Fields, a licensed private investigator, interviewed Ramirez on June 12, 2014. Ramirez had described how Jacques had driven by him and "sort of fake shot at him." Ramirez said that the passenger (Acevedo) had been "mean mugging him" as well. Ramirez had also told the investigator that Jacques had been swinging the bat, hard, when he came towards the group of Sureño gang members prior to being shot.

Defendant did not testify. During argument to the jury, his trial counsel asserted that defendant was "defending himself and others." Defendant's trial counsel argued that defendant "had a right" to shoot Jacques in self-defense because Jacques had a weapon and was moving aggressively towards defendant.

*People v. Alaniz*, No. H041643, 2016 WL 5787284, at *1-*6 (Cal. Ct. App. Oct. 4,

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

9

2016).

## III. DISCUSSION

### A. <u>**Standard of Review**</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

10

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## B.   **Claims and Analyses**

Petitioner raises the following nine claims in this federal habeas petition:  (1) the state appellate court's finding that the violation of Petitioner's right to confrontation was harmless was an unreasonable application of *Chapman v. California*, 386 U.S. 18 (1967); (2) the prosecutor committed misconduct and counsel was ineffective for failing to object; (3) the trial court erred by refusing to modify CALCRIM Nos. 335 and 336 to clarify that accomplice and informant testimony favoring the defense does not require corroboration; (4) trial counsel rendered ineffective assistance by failing to object to or seek correction of CALCRIM No. 3474, and the trial court failed to sua sponte modify CALCRIM No. 3474; (5) trial counsel rendered ineffective assistance by failing to request an instruction on justifiable homicide while attempting to apprehend a dangerous felon, and the trial court failed to sua sponte give such an instruction; (6) the admission of prejudicial hearsay from another gang member who stated, "this is for Menace," violated petitioner's right to confrontation, and counsel's failure to object to it was ineffective; (7) the admission of evidence about "irrelevant guns" violated Petitioner's constitutional rights, and counsel's failure to object was ineffective; (8) the evidence regarding premeditation, deliberation, and malice was insufficient; and (9) the cumulative effect of the errors resulted in

prejudice.

The Court will address each claim below.

### 1.    Gang expert testimony

Petitioner claims that Detective Rak, the gang expert, improperly referenced and relied upon hearsay evidence in his testimony. Specifically, Petitioner argues that Detective Rak's testimony, which relied on police reports written by other police officers regarding specific prior gang crimes and contacts, violated Petitioner's right to confrontation. Petitioner claims that, contrary to the California Court of Appeal's conclusion, these errors were not harmless.

At trial, the trial court gave the following limiting instruction before Detective Rak's testimony about Petitioner's prior gang-related contacts: "Ladies and gentlemen, . . . an expert is allowed to rely on hearsay in formulating his opinion. [¶] However, he's able to use that hearsay just for that purpose, and that is in formulating his opinion. So when he testifies to any hearsay statements like that, you're not to accept those statements as necessarily being true, the contents of those statements as being true, but they simply form the basis for the expert's opinion." *Alaniz*, 2016 WL 5787284, at *18.

After trial, the California Supreme Court clarified in *People v. Sanchez*, 63 Cal.4th 665 (2016), that "'case-specific statements' related by a gang expert constituted inadmissible hearsay and that admission of some of the statements constituted 'testimonial' hearsay under the Sixth Amendment." *Alaniz*, 2016 WL 5787284, at *18. Specifically, the inadmissible hearsay testimony in the underlying case provided the following: (1) on August 7, 2012, Petitioner was in a car with Sureño gang members, and after an officer felt a gun in Petitioner's pocket, Petitioner fled, Dkt. No. 2 at 328-29; (2) on June 13, 2011, Petitioner was present with gang members who were arrested for weapons, *id.* at 329; (3) in May 2007, Petitioner was with Jose Diaz, who had stabbed a man in the neck, *id.*; (4) in April 2007, Petitioner was detained with a group of Sureños

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

12

United States District Court
Northern District of California

who had travelled to Mountain View to assault rivals, *id.*; (5) Luis Martinez and other Sureños threw gang signs at an unmarked police car and Martinez pointed a gun at the car, *id.*; (6) Roberto Martinez confessed to stabbing and killing a Norteño, and was convicted of murder; and (7) Petitioner was contacted by law enforcement wearing blue clothes or accessories associated with Sureños, or admitted to being a Sureño, *id.* at 330.

The state appellate court agreed with Petitioner that Detective Rak's testimony on prior crimes and contacts based on police reports indeed violated Petitioner's Sixth Amendment right to confrontation. *Alaniz*, 2016 WL 5787284, at *18. Ultimately, however, the state appellate court found the erroneous admission of this testimony harmless.

In the federal petition, Petitioner claims that the constitutional error had a prejudicial effect on both the imposition of the gang enhancement as well as his conviction for first degree murder.[1] Dkt. No. 2 at 330-35 (Petition for Review).

As an initial matter, because the trial court dismissed Petitioner's gang enhancement, any harmlessness analysis is moot and the Court will not address it. Thus, the Court must determine whether the state court's conclusion that admission of Detective Rak's testimony was harmless as to Petitioner's murder conviction was unreasonable.

Assuming that admission of Detective Rak's testimony in reliance on hearsay violated *Crawford v. Washington*, 541 U.S. 36, 61 (2004), the question before this Court is

---

[1] Respondent adds that the allegation that erroneous admission of Detective Rak's testimony affected Petitioner's active participation in a criminal street gang conviction is unripe because the trial court stayed the sentence for that conviction. *See Trethewey v. Farmon*, No. 00-16747, 2002 WL 847996, at **4 (9th Cir. May 2, 2002) (unpublished memorandum disposition) (citing *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999)). In a conclusory manner, Petitioner responds that Respondent has conceded prejudicial error on the gang conviction and disputes the notion that this allegation is unripe. Dkt. No. 22 at 14. The record does not show that Respondent has made this concession. Based on the case law, the Court concludes that even if Petitioner had alleged that the admission of Detective Rak's testimony affected Petitioner's gang conviction, the allegation would be denied as unripe.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

whether the state appellate court's "harmless determination itself was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." *Ayala*, 135 S. Ct. at 2199 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). If this Court determines that the state court's harmless error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief. *See Fry*, 551 U.S. at 119-20.

Petitioner argues that the prosecutor used the inadmissible evidence to persuade the jury that Petitioner did not shoot in self-defense or defense of others, but that Petitioner was motivated to shoot because he was protecting his gang territory and did not want to lose the respect of other gang members. Dkt. No. 2 at 332.

Even without Detective Rak's testimony, the evidence demonstrated that Petitioner's motivation for killing Jacques was gang-related. Huerta, a former Sureño gang member, testified that he had spoken with Petitioner after the incident, and Petitioner admitted to killing Jacques. *Alaniz*, 2016 WL 5787284, at *2. Petitioner told Huerta that after Jacques and Acevedo chased Valdez, Petitioner and other Sureños chased Jacques and Acevedo. *Id.* Huerta explained that gang members need a gun to defend themselves against rival gang retaliations. *Id.* at *3. After Sureño gang member Menace was killed, the VTG had meetings, at which Petitioner was present, about defending themselves and their territory. *Id.*

Ramirez, another Sureño member, was present during the incident. He testified that as Acevedo was being stabbed, Jacques turned around and started running back toward Acevedo while swinging his bat or holding it up. *Id.* Ramirez saw Petitioner shoot Jacques. *Id.* Although Jacques initially fell down, he got back up, holding his thigh or his

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

14

lower back. *Id.* About five seconds later, Petitioner shot Jacques again. *Id.* At that time, Jacques was about 30 feet away from the Sureño group and Petitioner was about 20-23 feet away from Jacques. *Id.*

Castillo, another Sureño member, was not present at the incident, but testified that he shared a cell with Petitioner after the shooting. *Id.* at *4. Petitioner told Castillo that he had chased Norteños out of the park and shot one of them three times. *Id.* Petitioner stated that after the first shot, he saw the person fall down. *Id.* Even though the person got back up, Petitioner said that he shot the person again because the Norteños had attacked Valdez and Petitioner was the one with the gun. *Id.* Castillo testified that if Petitioner "had done nothing," Petitioner would have looked bad and lost the respect of the other gang members. *Id.*

Based on the evidence before the jury, even without Detective Rak's testimony, the evidence supported the jury's finding that the killing of Jacques was not done in self-defense or the defense of others, but in fact was gang-related. Thus, this Court cannot say that the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." *Ayala*, 135 S. Ct. at 2199 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Petitioner is not entitled to habeas relief on this claim.

### 2. Prosecutorial misconduct

Petitioner argues that the prosecutor committed multiple instances of misconduct during closing argument in the following ways: (1) repeatedly commenting that Petitioner had not presented any evidence of self-defense or defense of others; (2) asking the jury to "send a message" to Petitioner through its verdict; (3) suggesting there were witnesses who were afraid to come forward; (4) misstating the law regarding use of force; (5) misstating the law regarding premeditation and deliberation; and (6) the errors were cumulatively

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

prejudicial.  Dkt. No. 1 at 7-19.  The Court will address Petitioner's claims the order that the California Court of Appeal presented them in its opinion.

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).

To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam) (quoting *Harrington v. Richter*, 131 S. Ct. at 767-87).  The standard of *Darden* is a very general one that provides courts with more leeway in reaching outcomes in case-by-case determinations.  *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### a.    Comments on Petitioner's failure to present evidence

Petitioner claims that the prosecutor improperly argued that Petitioner failed to present evidence of self-defense or defense of others, in violation of *Griffin v. California*, 380 U.S. 609 (1965), *Doyle v. Ohio*, 426 U.S. 610 (1976), and improperly shifted the

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

16

United States District Court
Northern District of California

burden of proof to Petitioner.  Specifically, Petitioner claims that the prosecutor stated that none of the witnesses who spoke with Petitioner after the incident indicated that Petitioner believed he needed to use force or that Petitioner was acting in self-defense or defense of others.  Dkt. No. 18-15 at 191, 195, 197.

### i.  *Griffin* error

Petitioner asserts that the prosecutor's comments were improper references to Petitioner's failure to testify.  The California Court of Appeal rejected this claim in the following manner:

> The prosecutor did not commit *Griffin* error in this case, because in context, the challenged comments either referenced the "state of the evidence" or referenced "witnesses other than the defendant." (*See Sanchez*, *supra*, 228 Cal. App. 4th at p. 1524.)  When the prosecutor asserted that no witness had testified that defendant said he was acting in self-defense or defense of others, it was clear he was referring to Huerta and Ramirez, who had both described defendant's statements about the shooting and had not testified that defendant told them he believed he needed to defend himself or anyone else.  When the prosecutor asserted that there was no evidence that defendant actually believed he needed to shoot Jacques to defend himself or others, it was a comment on the state of the evidence — which included numerous statements from defendant regarding the shooting — and not an improper insinuation that defendant's failure to testify meant he was guilty.

*Alaniz*, 2016 WL 5787284, at *13.

This Court agrees with the state court's assessment.  The self-incrimination clause of the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California*, 380 U.S. 609, 615 (1965). Although the prosecutor may not comment about a defendant's failure to testify, the prosecutor may argue about the gaps in the defense case.

> There is a distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify. This Court has recognized that "'a prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, as long as it is not phrased to call attention to defendant's own failure to testify.'"  It is equally clear that "'[a] comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the

defendant's Fifth Amendment privilege.'"

*United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) (alteration in original) (citations omitted). "Criticism of defense theories and tactics is a proper subject of closing argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).

Here, the defense theory was that Petitioner was acting in self-defense or defense of others. "A prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). The prosecutor did not improperly call attention to Petitioner's choice not to testify; rather, the prosecutor's comments pointed out that these witnesses notably did not testify that Petitioner told them he killed Jacques in self-defense or defense of others.

Thus, the California Court of Appeal's rejection of Petitioner's *Griffin* claim was not contrary to, or an unreasonable application of, *Griffin*.

### ii. *Doyle* error

Petitioner claims that the prosecutor's comments improperly implicated Petitioner's right to remain silent in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). The California Court of Appeal rejected this claim as follows:

> Defendant's claim is based on the prosecutor's assertion that defendant "never" said that he was acting in self-defense or defense of others. However, the jury was not informed that defendant had invoked his right to remain silent following his arrest. Moreover, the prosecutor specified that defendant "never" said that he was acting in self-defense or defense of others when he talked about the shooting "to people that are his friends." In context, there is no reasonable likelihood the jury would have believed the prosecutor was referring to defendant's invocation of his right to remain silent following his arrest. Thus, the challenged comments do not amount to *Doyle* error.

*Alaniz*, 2016 WL 5787284, at *13.

Post-arrest silence after *Miranda* warnings cannot be commented upon or used by the prosecution. *See Doyle*, 426 U.S. at 611. Specifically, *Doyle* held that "the use for

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

18

impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619.

The prosecutor's comment, in full, was as follows:

> Ladies and gentlemen of the jury, the facts, as we can put them together in the intersection, coupled with what he said to people that are his friends about what happened in this homicide, not one time saying it was in self-defense, not one time saying he was trying to save somebody. He never said that. Ever. ¶ He tells you, through the people that testified, what this was.

Dkt. No. 18-15 at 121-22.

Petitioner's argument that the jury could have interpreted the prosecutor's statement that Petitioner "never" said he was acting in self-defense or defense of others to be a comment on Petitioner's right to remain silent at the time of his arrest is not a reasonable interpretation.

At most, even assuming the prosecutor's comment could be understood to be ambiguous, "[a] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from the plethora of less damaging interpretations." *Williams v. Borg*, 139 F.3d 737, 744 (9th Cir. 1998) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). In *Williams*, the prosecutor's comment that defendant "pay the price" could have referred to either the crimes defendant committed or could have referred to defendant insisting on going to trial. The comment was found not to be prejudicial because in the context of the entire proceedings it was "fair to infer" that the comment referred to the crimes defendant had committed. *See Williams*, 139 F.3d at 744. Prosecutorial comment must be examined in context. *See id.* at 745 (citing *United States v. Robinson*, 485 U.S. 25, 33 (1988)).

With that standard in mind, in context, it is fair to infer that the prosecutor's comment that Petitioner "never" said he was acting in self-defense or defense of others

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

19

referred to Petitioner's statements to fellow gang members who testified at trial. Taken in context, the prosecutor's comment was not a veiled reference to Petitioner's right to remain silent.

Thus, the California Court of Appeal's rejection of Petitioner's *Doyle* claim was not contrary to, or an unreasonable application of, *Doyle*.

### iii. Burden shifting

Petitioner claims that the prosecutor's comments impermissibly suggested that Petitioner had the burden of producing evidence that Petitioner believed in the need to use force when actually, the burden was on the prosecution to prove every element of the crimes. The California Court of Appeal rejected this claim:

> Here, all of the challenged comments by the prosecutor concerned the lack of evidence to support a finding that defendant shot Jacques in self-defense or defense of others. None of the prosecutor's comments indicated that defendant had the burden to provide such evidence. The challenged comments are distinguishable from those in the cases cited by defendant. (*See People v. Hill* (1998) 17 Cal.4th 800, 831 (*Hill*) [prosecutor told jury, "'There has to be some evidence on which to base a doubt'"]; *People v. Woods* (2006) 146 Cal. App. 4th 106, 113 [prosecutor asserted that "defense counsel had an 'obligation' to present evidence" and that certain evidence did not exist]; *People v. Edgar* (1917) 34 Cal. App. 459, 469 [prosecutor effectively told jury that "if the defendant were not guilty he could and should have" put on certain evidence].)
>
> In light of the evidence introduced at trial, it was not improper for the prosecutor to point out that there was no evidence that defendant believed he was acting in self-defense or defense of others. Two witnesses testified about statements defendant made about the shooting, and neither one reported that defendant said anything about acting in self-defense or defense of others. Huerta testified that defendant admitted he had killed Jacques but did not mention anything about Jacques swinging a bat at anyone. Castillo testified that defendant admitted shooting Jacques three times, and said he needed to do so after Jacques and Acevedo had attacked Valdez because "he was the one with the gun." Additionally, the prosecutor reminded the jury that he had the burden of proving all of the elements of the charged offense beyond a reasonable doubt, including the fact that the killing was "not excusable or justifiable." (*See Bradford*, *supra*, 15 Cal.4th at p. 1340 [no misconduct where prosecutor "reiterated that the prosecution had the burden of proof"].) In context, there is no "'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' [Citations.]" (*Cunningham*, *supra*, 25 Cal.4th at p. 1001.)

*Alaniz*, 2016 WL 5787284, at *12-*13.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

20

On habeas review, the relevant question is whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012) (quoting *Darden*, 477 U.S. at 181). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotation marks and citation omitted).

Here, the prosecutor's comments pointed out that no witness had testified that Petitioner believed he was acting in self-defense or defense of others. As the Ninth Circuit has held, "a prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). The prosecutor's comments did not suggest that Petitioner had any burden of proof. In fact, the prosecutor and defense counsel reminded the jury during closing arguments that the government had the burden of proving all of the elements of the crimes, including that any killing was not excusable or justifiable. Dkt. No. 18-15 at 95-96, 98, 180.

Thus, the California Court of Appeal's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### b. "Send a message"

Petitioner claims that the prosecutor improperly asked the jury to "send a message" to Petitioner through its guilty verdict thereby appealing to the jury's emotions and focusing on the consequences of its verdict rather than evidence of guilt. Specifically, Petitioner refers to three instances of these comments.

First, at the beginning of closing argument, the prosecutor remarked, "you have a message to send to [Petitioner] through your verdict, and whatever message that is, is going to be dependent on what you find." Dkt. No. 18-15 at 91.

Next, near the end of closing argument, the prosecutor stated:

[Petitioner] doesn't get to make that determination. The system does. That's why we have due process. That's why we have you. That's why we have a courtroom. [Petitioner] doesn't get to make that determination for Ricky Jacques.

He needs to be held accountable and send him a message through your verdict of murder with the firearm enhancement and the gang allegation that this is not acceptable in our community. It's not. If you reach any other verdict, the message that you send to him is, "Go right on back out to the apartments, just like you did after you killed this guy. Just go right on back out here and Enrique Valdez and hang out all day and smoke dope and drink; get more guns." You know he did three months after, and "Go about like it's business as usual. It's okay."

Ladies and gentlemen, it's not okay. Send a message to him through your verdict that this is unacceptable behavior in our community; that he be held accountable in a court of law where that's supposed to happen.

*Id.* at 122.

Third, in response to the prosecutor's closing argument, defense counsel told the jury, "we should also not be trying to render a verdict to save the neighborhood, to clean up the neighborhood, or to send messages." *Id.* at 181. In rebuttal, the prosecutor clarified, "At no point did I tell you to reach a verdict to clean up a neighborhood, but absolutely send a message to [Petitioner] with your verdict, absolutely, that this conduct is not acceptable in this community and [Petitioner's] standard that [Petitioner has] set up is not okay. It's dealt with here. ¶ And whatever verdict you send, [Petitioner] will get that. He will get that message." *Id.* at 197.

The California Court of Appeal rejected Petitioner's claim:

In arguing that the above comments were improper, defendant relies on *United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252. In that case, the defendant was charged with drug trafficking. At trial, he testified that "although he knew he was driving a vehicle containing drugs, he had done so under duress because drug traffickers had threatened his family." (*Id.* at p. 1255.) During closing argument, the prosecutor made the following remarks: "[W]hy don't we send a memo to all drug traffickers. . . . Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that they were forced to do it. Because . . . they'll get away with it if they just say their family was threatened." (*Id.* at p. 1256.) The Ninth Circuit found that the prosecutor's argument was improper, because the "'send a memo' statement urged the jury to convict 'for reasons wholly irrelevant to [Sanchez's] guilt or innocence.' [Citation.]" (*Id.* at p. 1257.) That is, the jury would be telling other drug dealers to use the duress defense, which would encourage "increased lawbreaking, because couriers would be less afraid of conviction." (*Ibid.*) Arguing that the jury's verdict should be based on these

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

22

United States District Court
Northern District of California

"'potential social ramifications'" that went "beyond the facts of the particular case," the prosecutor "did not merely comment on the evidence and arguments in the case, but also 'appeal[ed] to the passions, fears and vulnerabilities of the jury.'" (*Ibid.*)

In the instant case, the prosecutor did not tell the jury that its verdict would send a message to anyone but defendant himself. Unlike in *United States v. Sanchez*, the prosecutor did not insinuate that by finding defendant not guilty, other criminals would be encouraged to commit crimes and assert the same defenses. Thus, the prosecutor did not urge the jury to convict defendant "'for reasons wholly irrelevant to [his] guilt or innocence'" nor suggest that the jury's verdict should be based on "'potential social ramifications'" that went beyond the facts of this particular case. (*United States v. Sanchez*, *supra*, 659 F.3d at p. 1257.)

Defendant also relies on *People v. Lloyd* (2015) 236 Cal. App. 4th 49 (*Lloyd*), in which the defendant stabbed the victim during an altercation. During closing argument, the prosecutor argued, "'If you find there is self-defense, you are saying his actions, the defendant's conduct was absolutely acceptable.'" (*Id*. at p. 62.) The prosecutor also asserted that if the jurors voted to find the defendant not guilty, they would be saying that they condoned his behavior and that he did not commit a crime. The *Lloyd* court found that these comments each constituted "a misstatement of the law." (*Ibid*.) The court explained that the prosecutor had committed misconduct and reduced the burden of proof by "equating a not guilty verdict based on self-defense or defense of others as meaning the defendant must establish the defense to the point the jury considers his actions 'absolutely acceptable' and by arguing not guilty means the defendant is innocent." (*Id*. at p. 63.)

In the instant case, the prosecutor urged the jury to send a message to defendant that his conduct was unacceptable by finding him guilty of murder, and the prosecutor asserted that "any other verdict" would tell defendant that it was "okay" for him to go back to the apartments and get more guns. These comments did not equate a not guilty verdict with innocence or suggest that defendant had the burden to establish that his conduct was "'absolutely acceptable'" before the jury could find that he acted in self-defense or defense of others. (*See Lloyd*, 236 Cal. App. 4th at p. 63.) In fact, the prosecutor reminded the jury that he had the burden of proving all of the elements of the charged offense beyond a reasonable doubt, including the fact that the killing was "not excusable or justifiable." There is no reasonable likelihood that the jury construed the challenged remarks in a manner that reduced the prosecution's burden of proof.

*Alaniz*, 2016 WL 5787284, at *14-*15.

A prosecutor may not make comments calculated to arouse the passions or prejudices of the jury. *Viereck v. United States*, 318 U.S. 236, 247-48 (1943). "[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

23

irrelevant to his own guilt or innocence." *United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (Citations and internal quotation marks omitted). "Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) (Citations and internal quotation marks omitted).

The prosecutor's comments, taken in context, did not appear to be designed to inflame the jury, but instead explained to the jury that they were the arbiters of determining the boundaries of lawful behavior. In order to decide whether Petitioner's conduct amounted to murder, the jury was required to decide whether Petitioner's actions were acceptable or unlawful. The prosecutor asked the jury to send a message to Petitioner about whether or not Petitioner's actions were lawful; the jury was not asked to maintain social order, or deliver a verdict to uphold community values, and the prosecutor clarified as such in his rebuttal.

Taken in context, the Court cannot say that the state appellate court's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.

### c.     Fearful witnesses

Petitioner claims that the prosecutor committed misconduct when he stated that there were witnesses from the neighborhood who were afraid to come forward. Petitioner argues that the comments improperly referred to facts not in evidence, and suggested to the jury that Petitioner and his associates had threatened potential witnesses.

The California Court of Appeal rejected this claim:

> During argument to the jury, the prosecutor noted that no "civilian[s]" had testified in the case. The prosecutor then stated: "People do not come forward, and it's because of people like [defendant] . . . ." The prosecutor referred to the neighborhood as "a war zone" and reminded the jury that a young man was dead. The prosecutor argued that the jury should not discount the value of Jacques's life even though he was a gang member and even though Jacques and Acevedo were "jerks." The prosecutor reminded the jury that bullets had struck a nearby

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

24

apartment complex and a car parked on the street, telling the jury, "That's why this is important, because those poor people in that neighborhood [are] too scared to come forward." Defendant's objection – that "[t]here was no evidence about witnesses being too scared to come forward" – was overruled.

A prosecutor's reference to facts not in evidence amounts to misconduct "because such statements 'tend[ ] to make the prosecutor his [or her] own witness – offering unsworn testimony not subject to cross-examination.'" (*Hill*, *supra*, 17 Cal.4th at p. 828.) However, "'"'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge . . . .'"'" (*Id.* at p. 819.)

First, we find no reasonable likelihood the jury interpreted the prosecutor's comments as suggesting that defendant or his associates had actually threatened witnesses in an attempt to prevent them from coming forward. The gist of the prosecutor's challenged remarks was that people in violent neighborhoods are often scared of further violence. The prosecutor did not suggest that anyone in the McLaughlin Park neighborhood had in fact been deterred from coming forward with evidence due to specific threats.

Likewise, there is no reasonable likelihood the jury interpreted the prosecutor's challenged remarks as an appeal to convict defendant out of sympathy for the people who lived in the McLaughlin Park neighborhood. "[I]t 'is permissible to comment on the serious and increasing menace of criminal conduct and the necessity of a strong sense of duty on the part of jurors. [Citation.]'" (*People v. Adanandus* (2007) 157 Cal. App. 4th 496, 513.) Here, the prosecutor's comments were made in the context of reminding the jury to do its duty in the case, even though Jacques was a gang member. Thus, to the extent the prosecutor's comments about the people in the neighborhood constituted "an emotional appeal to the jury, it was not 'excessively so,' but rather was 'based on the evidence and fell within the permissible bounds of argument.' [Citation.]" (*Id.* at p. 514.)

It is a closer question whether the prosecutor committed misconduct by insinuating that potential witnesses for defendant's trial were too scared to come forward when he asserted that "people in that neighborhood" were "too scared to come forward." Even assuming the prosecutor committed misconduct, these remarks were not prejudicial. In determining prejudice, "'"we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) When making the challenged remarks, the prosecutor also asserted that people are often scared to come forward as witnesses due to "people like [defendant]." Since the evidence established that the McLaughlin Park neighborhood had long been the center of gang activity, the jury was likely to understand that the prosecutor was making a generalization and not suggesting that he was aware of witnesses who had not come forward or testified against defendant. Moreover, "the remarks were brief and fleeting." (*Id.* at p. 554.) Any misconduct was therefore harmless.

*Alaniz*, 2016 WL 5787284, at *15-*16.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

25

Again, "[a] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from the plethora of less damaging interpretations." *Williams*, 139 F.3d 737, 744 (9th Cir. 1998) (citing *Donnelly*, 416 U.S. at 647 (1974)). Prosecutorial comment must be examined in context. *See id.* at 745 (citing *United States v. Robinson*, 485 U.S. 25, 33 (1988)).

Here, it is fair to infer that, as the trial court stated in overruling defense counsel's objection, the prosecutor's comment about civilians being too fearful to come forward was proper argument. Dkt. No. 18-15 at 116. These comments, taken in context, were made during the prosecutor's argument to persuade the jury that Petitioner was acting for the benefit of the gang, describing how the McLaughlin Park neighborhood was gang territory and what that meant. Dkt. No. 18-15 at 114. The prosecutor went on to surmise that the people in that neighborhood were afraid to come forward because their neighborhood is a "war zone." *Id.* at 114-15. The neighborhood knew about the gang's reputation and were afraid of the gang. *Id.* The prosecutor then reminded the jury that even though the parties directly involved were "gangsters," the jury should still care about the case because the gang's actions affect not only the gang members but the neighborhood as well. *Id.* at 115.

The Court agrees that it was not reasonably likely that the jury inferred the prosecutor's comments to suggest that Petitioner or any of his associates actually threatened witnesses to prevent them from testifying. As stated above, reading the comments in context shows that the prosecutor's argument focused on the state of the neighborhood and the inference that civilians in McLaughlin Park knew about and were afraid of the gangs in their neighborhood.

Even assuming that the comments improperly appealed to the jury's sympathies or implied that potential witnesses were too scared to come forward to testify in Petitioner's trial, the Court cannot say that they "had substantial and injurious effect or influence in

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

26

1    determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

2    Notably, Petitioner's gang enhancement was ultimately stricken, and Petitioner's sentence

3    for his gang conviction was stayed.  Thus, because Petitioner can only be entitled to habeas

4    relief based on trial error unless they can establish that it resulted in "actual" prejudice, *id.*

5    at 637-38, Petitioner must show that these comments had a substantial impact on the jury's

6    decision to convict Petitioner of first degree murder and find that Petitioner personally

7    discharged a firearm.

8         With respect to the firearm enhancement, Petitioner admitted to Huerta that

9    Petitioner killed Jacques with a gun.  Ramirez testified that Ramirez saw Petitioner shoot

10   Jacques.  There can be no argument that the prosecutor's comments had any effect on the

11   imposition of Petitioner's firearm enhancement.

12        With respect to the first degree murder conviction, the Court also cannot say that

13   the comments had a substantial and injurious effect in determining the jury's verdict.  The

14   challenged comments are sprinkled over two pages of the prosecutor's closing argument,

15   which totaled 31 pages.  Dkt. No. 18-15 at 91-122.  The likelihood of the jury interpreting

16   the prosecutor's comments to mean that there were witnesses who could have testified but

17   were too afraid to come forward is small.  Moreover, the challenged comments, taken in

18   context, were made to persuade the jury to find that Petitioner's actions were for the

19   benefit of the gang.  Dkt. No. 18-15 at 114.  They were not directly relevant to any element

20   of first degree murder.  The comments were not significant, nor the focal point of the

21   prosecutor's closing argument.  In addition, the trial court reminded the jury that

22   arguments of counsel were not considered evidence.  Dkt. No. 18-15 at 91.  For all these

23   reasons, the Court concludes that the challenged comments, even if improper, did not have

24   a substantial and injurious effect in determining the jury's verdict.

25        Thus, the state appellate court's rejection of this claim was not contrary to, or an

26   unreasonable application of, clearly established Supreme Court law.

27   Case No. 17-03569 BLF (PR)
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
28   APPEALABILITY; DIRECTIONS TO CLERK

#### d.     Statements regarding use of force

Petitioner claims that the prosecutor repeatedly misstated the law regarding the use

of force.  Specifically, the prosecutor told the jury that when Jacques and Acevedo

withdrew from the confrontation, that action negated Petitioner's right to use force.  Dkt.

No. 18-15 at 118.  In addition, Petitioner argues that the prosecutor's statement that

Acevedo and Jacques' "responsibility" ended when they turned to flee was a misstatement

of the law.

The California Court of Appeal rejected Petitioner's claim.

> The prosecutor argued that when Jacques and Acevedo "turn[ed] tail" and left the
> park, defendant no longer had the right to shoot anyone.  He argued that Jacques
> and Acevedo had "withdrawn from that confrontation" and that the situation had
> turned into a "pursuit," during which defendant could not act in defense of Valdez
> because there was "no more danger."  Defendant's trial counsel did not object to
> these remarks.

> According to defendant, the prosecutor's comments erroneously suggested that "the
> right to use force ended the moment that Acevedo and Jacques turned to flee" and
> that "withdrawal itself was sufficient to negate the right to use force, even if the
> danger continued or returned."

> As noted above, the jury instructions correctly stated that defendant's right to use
> force in self-defense or defense of others did not end when Jacques and Acevedo
> fled, but rather when the danger had passed.  CALCRIM No. 3474 informed the
> jury that "[t]he right to use force in self-defense or defense of another continues
> only as long as the danger exists or reasonably appears to exist," and CALCRIM
> No. 505 informed the jury that a defendant is entitled, "if reasonably necessary, to
> pursue an assailant until the danger of death or great bodily injury has passed."  The
> prosecutor's argument – that defendant could not act in defense of Valdez after
> Jacques and Acevedo had "withdrawn from that confrontation" and that the
> situation presented "no more danger" – was consistent with these principles.  There
> is no reasonable likelihood the jury interpreted the prosecutor's comments as
> misstating the standard for the lawful use of force.

*Alaniz*, 2016 WL 5787284, at *16.

A prosecutor's mischaracterization of a jury instruction is less likely to render a trial

fundamentally unfair than if the trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a jury
> than do instructions from the court.  The former are not
> evidence, and are likely viewed as the statements of advocates;

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY; DIRECTIONS TO CLERK

28

> the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384-85 (1989) (citations omitted).

Here, Petitioner does not argue that the jury instructions provided were legally inaccurate. In addition, a review of the challenged comments shows that the prosecutor was proffering one interpretation of the evidence heard by the jury – that Petitioner and his friends were not in imminent danger after Jacques and Acevedo began running away from Petitioner and his friends. The prosecutor went on to describe that when Jacques turned around to come back, Jacques was no closer than 19 feet from Petitioner, in an effort to argue that it was not plausible that Jacques presented any danger sufficient to act in self-defense. Dkt. No. 18-15 at 120-21. In rebuttal, the prosecutor specified that the evidence showed two separate instances: the first being when Jacques and Acevedo were on the offensive, and the second beginning when Jacques and Acevedo began to run away. *Id.* at 186-87. The argument suggested that once Jacques and Acevedo withdrew from attack, the imminent danger was over and did not return. In fact, defense counsel offered the alternative theory that imminent danger was still present. Counsel emphasized that the law allows one to "pursue an assailant until the danger has passed," *id.* at 175, and that the evidence showed the danger was immediate and there was no break in the action, *id.* at 178-79. Read in context, the prosecutor's challenged comments did not render the trial fundamentally unfair.

Petitioner also argues that the prosecutor improperly stated that Acevedo and Jacques' "responsibility" ended when they turned to flee. Petitioner claims that the prosecutor's statement misstated the "provocative act doctrine" of the law of homicide. That is, under California law, Acevedo would be criminally responsible for the murder of

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

29

Jacques as an accomplice because of his attempted murder of Valdez and Orozco.

The prosecutor stated:

[I]n no way, shape, or form am I suggesting that Noe Acevedo or Ricky Jacques do not bear responsibility for what happened that night. Absolutely not. They bear responsibility.

Noe Acevedo's paid a price. You saw the pictures of him. Being stabbed and beat. Ricky Jacques paid the ultimate price for his decisions that evening. They set this in motion. There's no question.

But there's a point at which that ends. And that ends the moment they're out of that park and they've turned tails and they've run.

Dkt. No. 18-15 at 93.

The California Court of Appeal did not directly address this claim. Nonetheless, reading the prosecutor's comments in context, it is clear that the prosecutor was not referring to criminal legal responsibility, nor is there any indication that the jury would have made that assumption. In addition, whether or not Acevedo or Jacques bore any "responsibility" in a layman's understanding of the word, it is not reasonable to conclude that the statement infected the trial with unfairness.

The state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### e. Statements regarding premeditation and deliberation

Petitioner claims that the prosecutor misstated the law on premeditation and deliberation during closing argument. Specifically, regarding premeditation, Petitioner states that the prosecutor improperly informed the jury that Petitioner's decision to pre-arm himself was a factor demonstrating premeditation. Regarding deliberation, Petitioner argues that the prosecutor's statement that Petitioner did not have to "consciously weigh the options" in order to have demonstrated deliberation was in error.

The California Court of Appeal rejected this claim. "Regarding premeditation, the prosecutor did not misstate the law when he argued that premeditation was shown, in part,

by defendant having "made a choice that day to pre-arm himself." Defendant did not need to have "planned to kill [Jacques] before he saw him on the day of the incident," and the act of carrying a loaded gun does show "prior planning activity," which is relevant to the question of premeditation." *Alaniz*, 2016 WL 5787284, at *17 (citation omitted).

Based on the state court's conclusion that the prosecutor's comment was an accurate statement of the law, the prosecutor's comment regarding premeditation was not improper. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *see also West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Petitioner argues that the improper comment implicated the Second Amendment. Respondent argues that Petitioner failed to raise this claim to the California Court of Appeal and it is unexhausted. Nonetheless, the Court addresses it here. *See* 28 U.S.C. § 2254(b)(2). The Second Amendment confers on an individual the right to own and possess arms for traditionally lawful purposes, such as self-defense within the home. *District of Columbia v. Heller*, 554 U.S. 570, 709-10 (2008). However, there is no clearly established law even hinting that the Second Amendment is threatened if a prosecutor uses evidence of pre-arming as a factor to establish the element of premeditation.

Regarding deliberation, the California Court of Appeal concluded that the prosecutor's comment was improper because it contradicted CALCRIM No. 521, which stated that a "defendant acts deliberately if he or she "carefully weighed the considerations for and against (his or her) choice and, knowing the consequences, decided to kill." *Alaniz*, 2016 WL 5787284, at *17. In finding the comment harmless, the Court of Appeal reasoned:

However, the prosecutor had previously told the jury, "Deliberate means a

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

31

considered choice. You considered whether or not to do it and you made the decision to do it. You considered the pros and cons whether or not you're going to shoot somebody and you did it anyway." The prosecutor also later told the jury, "[S]omeone who weighs their options and thinks about it and makes a judgment to pull the trigger is more culpable than someone who just intentionally pulled the trigger." The prosecutor then reiterated that "[d]eliberate" meant "thoughts of killing and weighing the consideration for or against the killing." Even if reasonable trial counsel would have objected and requested a curative admonition, there is no reasonable probability that the jury would have reached a result more favorable to defendant considering all the prosecutor's comments about deliberation as well as the jury instructions, which stated the proper standard.

*Id.* (citation omitted).

Because the California Court of Appeal found error, the question before this Court is whether the state appellate court's "harmless determination itself was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). In other words, as stated previously, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." *Ayala*, 135 S. Ct. at 2199 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). If this Court determines that the state court's harmless error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief. *See Fry*, 551 U.S. at 119-20.

The jury was properly instructed with CALCRIM No. 521 which stated, "defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." In addition, according to the California Court of Appeal, the prosecutor correctly illustrated deliberation three times during closing argument. It was not objectively unreasonable for the state appellate court then to find that one inaccurate statement was harmless in the face of three correct statements and a proper jury instruction.

For these reasons, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

32

### f.    Cumulative error

Petitioner claims that the cumulative effect of the prosecutorial misconduct errors prejudiced him.  The California Court of Appeal did not directly discuss this claim but implicitly rejected it.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  The Ninth Circuit has noted that the cumulative effect of more than one error can violate due process when they "they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2001).

Here, the California Court of Appeal assumed without deciding that the prosecutor's comment insinuating that there were witnesses who were afraid to testify was misconduct.  In addition, the California Court of Appeal found error when the prosecutor told the jury that Petitioner did not have to consciously weigh his options in order for the jury to find deliberation.

These two errors did not amplify each other in relation to a key contested issue.  While the misstatement regarding deliberation was directly relevant (but harmless by itself) to the contested issue of whether Petitioner deliberately killed Jacques, the comment regarding fearful witnesses, as stated previously, did not have a real impact on the issue of whether Petitioner was guilty of first degree murder.  That is, these two comments did not share a "unique symmetry" and together, were not directly related to a key contested issue at trial.  *See Parle v. Runnels*, 505 F.3d 922, 932-33 (9th Cir. 2007) (wrongful inclusion of evidence and wrongful exclusion of evidence amplified the prejudice caused by the other and went to the heart of the central issue).

1    Accordingly, the state court's rejection of this claim was not contrary to, or an

2    unreasonable application of, clearly established Supreme Court law.

3              **g.    Ineffective assistance of counsel**

4    Petitioner claims that the failure of counsel to object to all but one of these

5    allegations of prosecutorial misconduct, i.e., the comments about potential witnesses being

6    fearful to come forward, amounts to ineffective assistance of counsel.  The California

7    Court of Appeal did not explicitly address this claim, but in rejecting the prosecutorial

8    misconduct allegations, it implicitly also rejected the ineffective assistance claim.

9    A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

10   Sixth Amendment right to counsel, which guarantees not only assistance, but effective

11   assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to

12   prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish

13   two things.  First, he must establish that counsel's performance was deficient, i.e., that it

14   fell below an "objective standard of reasonableness" under prevailing professional norms.

15   *Id.* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient

16   performance, i.e., that "there is a reasonable probability that, but for counsel's

17   unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

18   A reasonable probability is a probability sufficient to undermine confidence in the

19   outcome.  *Id.*  In other words, where the defendant is challenging his conviction, the

20   appropriate question is "'whether there is a reasonable probability that, absent the errors,

21   the factfinder would have had a reasonable doubt respecting guilt.'"  *Hinton v. Alabama*,

22   134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694).

23   For the prosecutorial misconduct allegations to which counsel failed to object, the

24   California Court of Appeal denied them as meritless.  Because counsel cannot have been

25   ineffective for failing to raise a meritless objection, *see Juan H. v. Allen*, 408 F.3d 1262,

26   1273 (9th Cir. 2005), the Court concludes that the state court's denial of these ineffective

27   Case No. 17-03569 BLF (PR)
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
28   APPEALABILITY; DIRECTIONS TO CLERK

assistance allegations was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

For the remaining allegation to which counsel did object, the California Court of Appeal found that the error was harmless. Trial counsel's failure to object to a harmless error was not deficient performance. *Robinson v. Giurbino*, No. 03-55342, 107 Fed. Appx. 711, at **1 (9th Cir. 2004) (unpublished memorandum disposition) (citing *Strickland*, 466 U.S. at 687-88); *see, e.g.*, *Flournoy v. Small*, 681 F.3d 1000, 1006 (9th Cir. 2012) ("The failure to make an objection that would have been overruled was not deficient performance."); *LePage v. Idaho*, 851 F.2d 251, 256 (9th Cir. 1988) (concluding that because improperly admitted statements were harmless error, appellant necessarily did not suffer prejudice from counsel's failure to object). Thus, the state court's denial of this ineffective assistance allegation was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 3.     CALCRIM Nos. 335 and 336

Petitioner claims that the trial court erred by refusing to modify CALCRIM Nos. 335 and 336 to clarify that accomplice and informant testimony that was favorable to the defense did not require corroboration. Petitioner asserts that Ramirez and Castillo both provided testimony that favored the defense.

CALCRIM No. 335[2] informed the jury that murder or manslaughter was

---

[2] CALCRIM No. 335 stated, "If the crime of murder or manslaughter was committed, then Miguel Ramirez was an accomplice to that crime. You may not convict the defendant of murder or manslaughter based on the statements or testimony of an accomplice alone. [¶] You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] One, the accomplice's statement or testimony is supported by other evidence that you believe; [¶] Two, that supporting evidence is independent of the accomplice's statement or testimony; [¶] And, three, that supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove the defendant guilty of the alleged or the charged crime, and it doesn't need to support every fact mentioned by the accomplice in the statement or about which the witness testified. [¶] On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. [¶] Supporting evidence must tend to connect the

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

35

committed, then Ramirez was an accomplice to that crime. Dkt. No. 18-11 at 34. It went on to instruct the jury could not convict Petitioner of murder or manslaughter solely on Ramirez's testimony. *Id.* It could convict Petitioner of murder or manslaughter based on Ramirez's testimony only if the testimony was also supported by independent and corroborating evidence connecting Petitioner to the commission of the crime. *Id.* CALCRIM No. 336[3] informed the jury that in order to use an in-custody informant's testimony, it also had to be supported by independent and corroborating evidence connecting Petitioner to the commission of the crime. *Id.* at 35. However, CALCRIM No. 336 did not specify that this requirement was only applicable if the jury was to convict.

The California Court of Appeal rejected this claim:

> "[W]hen an accomplice is called to testify on behalf of the prosecution, the court must instruct the jurors that accomplice testimony should be viewed with distrust.

_____

defendant to the commission of a crime. [¶] The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. [¶] Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. [¶] You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in light of all the other evidence." Dkt. No. 18-11 at 34.

[3] CALCRIM No. 336 stated, "The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of or an expectation of any benefit from the party calling that witness. [¶] This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case. [¶] You may use the statement or testimony of an in-custody informant only if: [¶] One, the statement or testimony is supported by other evidence that you believe; [¶] Two, that supporting evidence is independent of a statement or testimony; [¶] Three, that supporting evidence connects the defendant to the commission of the crimes. [¶] Supporting evidence is not sufficient if it merely shows the charged crime was committed. Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove the defendant is guilty of the charged crime, and it doesn't need to support every fact mentioned . . . by the in-custody witness or about which the witness testified. [¶] On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed [or] the circumstances of its commission. Supporting evidence must tend to connect the defendant to the commission of the crime. [¶] An in-custody informant is someone other than a co-defendant or percipient witness or accomplice or co-conspirator whose testimony is based on a statement the defendant allegedly made while both the defendant and the informant were held within a correction institution. [¶] Juan Carlos Ramos Castillo is an in-custody informant. [¶] . . . Santa Clara County Jail is a correctional institution." Dkt. No. 18-11 at 35.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

36

[Citation.]"  (*People v. Guiuan* (1998) 18 Cal.4th 558, 565 (*Guiuan*); *see also People v. Davis* (2013) 217 Cal. App. 4th 1484, 1489 (*Davis*) [same rule applies to testimony of an in-custody informant].)  The rationale for this rule is that such accomplice testimony is "subject to the taint of an improper motive, i.e., that of promoting his or her own self interest by inculpating the defendant."  (*Guiuan, supra*, at p. 568.)  That rationale is inapplicable, however, "[t]o the extent such witness testifies on behalf of the defendant," and in such cases the trial court has a sua sponte duty "'to instruct the jurors that they should regard with distrust only [the accomplice's] testimony on behalf of the prosecution.' [Citation.]"  (*Ibid.*; *see also People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 104 [approving instruction that distinguished between codefendant's testimony "'in her own defense'" and "'her testimony against'" the defendant].)  FN4.

> FN4.  In *Guiuan*, the California Supreme Court concluded "that the instruction concerning accomplice testimony should henceforth refer only to testimony that tends to incriminate the defendant" and suggested the following: "'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution.  This does not mean, however, that you may arbitrarily disregard that testimony.  You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.'"  (*Guiuan, supra*, 18 Cal.4th at p. 569.)  CALCRIM No. 335 has not been modified to reflect the language recommended by *Guiuan*, however.

The Attorney General asserts that the trial court correctly declined to modify the accomplice and in-custody informant instructions because CALCRIM No. 335 already makes it clear that the corroboration requirement applies only when the jury is using "the statement or testimony of an accomplice to *convict the defendant*" (italics added) and because CALCRIM No. 336 implicitly contained the same limitation with respect to the testimony of an in-custody informant.  The Attorney General further asserts that no modification was necessary because neither Ramirez nor Castillo gave testimony that was favorable to the defense.  Moreover, the Attorney General argues, any error was harmless because any favorable testimony by Ramirez and Castillo was corroborated.

With respect to CALCRIM No. 335, which pertained to Ramirez's testimony, we agree with defendant that Ramirez provided testimony that was favorable to defendant.  For instance, Ramirez believed Jacques and Acevedo still posed a threat even as they were running away and even after Acevedo fell down, because of their weapons.  However, CALCRIM No. 335 required corroboration of Ramirez's testimony only to the extent the jury relied on that testimony "to convict the defendant."  We must presume that jurors are "intelligent and capable of understanding and applying the court's instructions"  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940 (*Gonzales*)), such that they were able to distinguish between testimony used "to convict" – i.e., unfavorable testimony – and testimony that was favorable to the defense.  The trial court therefore did not err by declining to modify CALCRIM No. 335.

With respect to CALCRIM No. 336, defendant asserts that Castillo's testimony was favorable because he conveyed defendant's statement about believing he needed to shoot Jacques because the Norteños had attacked Valdez and defendant "was the one with the gun."  Defendant asserts that the jury could have found that defendant

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

37

United States District Court
Northern District of California

meant that he was protecting Valdez. However, Castillo explained that this statement meant that defendant was afraid he would "look bad" to the other Sureño gang members if he failed to use the gun. Since Castillo's testimony strongly supported the inference that defendant was acting out of loyalty to his gang, we agree with the Attorney General that Castillo's testimony was not favorable to the defense.

But even assuming that the jury could have interpreted Castillo's testimony as favorable to the defense, the trial court's failure to modify CALCRIM No. 336 was necessarily harmless because Castillo's testimony was corroborated, and thus the jury could have used his testimony regardless of whether it favored the defense or prosecution. "The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense." (§ 1111.5, subd. (a); *see Davis*, *supra*, 217 Cal. App. 4th at pp. 1489-1490.) Defendant was connected with the commission of the offense by the testimony of several other witnesses, including Huerta, Orozco, and Ramirez. Moreover, Castillo's testimony about the meaning of defendant's statement was corroborated by the expert testimony of Detective Rak, who testified that gangs often entrust the gang's guns to one member. Since Castillo's testimony was corroborated, the jury was not barred from considering Castillo's testimony for any purpose. Therefore, it is not reasonably probable that a result more favorable to defendant would have been reached had the trial court informed the jury that Castillo's testimony did not require corroboration if his testimony favored the defense. (*See People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Alaniz*, 2016 WL 5787284, at *8-*9.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.*

This Court agrees that CALCRIM No. 335 as given did not so infect the entire trial such that the resulting conviction violated due process. The instruction was clear that the limitations on relying on Ramirez's testimony as an accomplice only applied if the jury were to use it to convict Petitioner. There was no reasonable likelihood that the jury would have applied the corroborative requirement if the testimony would not be used to convict Petitioner.

CALCRIM No. 336 on the other hand was ambiguous. In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the

instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See id.* & n.4. In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted). A "meager 'possibility'" that the jury misapplied the instruction is not enough. *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Here, even assuming there was both ambiguity and a reasonable likelihood that the jury applied CALCRIM No. 336 in a way that violated the Constitution, the Court finds that there was no substantial or injurious effect on the verdict. Even if, as Petitioner argues, the jury interpreted Castillo's testimony that Petitioner told him he shot Jacques in order to protect his fellow gang members, and even if that particular statement was favorable to the defense, because Castillo's testimony was corroborated by the testimony of other witnesses, CALCRIM No. 336 did not preclude the jury from considering Castillo's testimony. As a result, Petitioner cannot show that CALCRIM No. 336 had a substantial or injurious effect on the jury's verdict.

Thus, the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 4. CALCRIM No. 3474

Petitioner claims that the disjunctive language of CALCRIM No. 3474 prejudicially misled the jury into believing that Petitioner had no right to use force if Jacques merely withdrew from the attack even if Petitioner was still in danger. Specifically, Petitioner challenges the phrasing of the instruction that stated, "When the attacker withdraws/*or* no longer appears capable of inflicting any injury, then the right to use force ends." Dkt. No.

18-11 at 55 (emphasis added). Petitioner concedes that while the instruction may be correct as a general principle of law, it was prejudicial error to provide it in this case. He argues that the trial court failed to *sua sponte* modify CALCRIM No. 3474, and counsel was ineffective for failing to request such a modification.

The California Court of Appeal rejected Petitioner's claim.

> In the context of the instruction as a whole and on this record, we find no reasonable likelihood the jury believed defendant's right to use force in self-defense or defense of others ended when Jacques and Acevedo fled. The first sentence of CALCRIM No. 3474 told the jury, "The right to use force in self-defense or defense of another continues only *as long as the danger exists or reasonably appears to exist*." (Italics added.) This sentence was entirely consistent with defendant's theory of the case: that he reasonably believed Jacques, who was armed, was returning to attack. The jury was also instructed, pursuant to CALCRIM No. 505, that a defendant is entitled, "if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed." This instruction reinforced the principle that, in determining whether defendant's actions were justified, the relevant question for the jury was whether Jacques continued to pose a danger. Therefore, the trial court did not have a sua sponte duty to modify CALCRIM No. 3474.

*Alaniz*, 2016 WL 5787284, at *11.

CALCRIM No. 3474, entitled, "Danger no longer exists or attacker disabled," stated in full:

> The right to use self-defense/or defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws/or no longer appears capable of inflicting any injury, then the right to use force ends.

Dkt. No. 18-11 at 55.

Reading the challenged sentence in conjunction with the immediately preceding one makes clear that Petitioner had a right to defend himself or others as long as there was a continuing danger. As the California Court of Appeal noted, CALCRIM No. 505 described in detail the law of self-defense and defense of others. *Id.* at 53-54. It instructed the jury that Petitioner lawfully defended himself or others if he believed there was imminent danger of death or great bodily harm; that if Petitioner was threatened or harmed by Jacques in the past, Petitioner would be justified in acting more quickly or taking

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

40

greater self-defense measures against him; and that Petitioner was not required to retreat and in fact, was permitted to pursue Jacques until the danger of death or great bodily injury had passed. *Id.* In addition, as stated previously, the prosecutor's and defense counsel's closing argument specifically discussed the requirement of imminent danger for justifiable homicide. Considering the instructions as a whole as well as the trial court record, there is no reasonable likelihood that the jury improperly believed that Jacques' withdrawal from the attack by itself removed Petitioner's right to use force even if Petitioner was still in danger.

Because CALCRIM No. 3474 did not mislead the jury, Petitioner could not have been prejudiced by counsel's failure to request modification of it. *See Strickland*, 466 U.S. 694.

Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 5. Failure to request instruction on justifiable homicide in making arrest

Petitioner argues that the trial court should have *sua sponte* instructed the jury with CALCRIM No. 508 because Petitioner was armed and part of a crowd attempting to apprehend Jacques and Acevedo, who had just attempted to kill Valdez and Orozco. CALCRIM No. 508 is the instruction on justifiable homicide due to a citizen's arrest by a non-peace officer.

The California Court of Appeal rejected this claim.

"A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) The trial court also has "a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"' [Citation.]" (*Ibid.*)

Defendant relies primarily on *People v. Lillard* (1912) 18 Cal. App. 343 (*Lillard*), in which the appellate court reversed a manslaughter conviction upon finding the homicide was justified under section 197, subdivision (4). In *Lillard*, a woman was

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

41

attacked in her home, but the attacker fled after the woman screamed "'murder' and 'police.'" (*Lillard*, *supra*, at p. 344.) A crowd outside heard the woman continue to scream "'stop thief,' 'murder,' 'police,'" and the crowd repeated these cries as the attacker fled down the street. (*Ibid.*) The defendant heard the woman's cries and saw the attacker running with a crowd chasing him. The defendant picked up a gun and joined the pursuit. The attacker "paid no attention to the demands to stop," and the defendant eventually shot him. (*Ibid.*) The *Lillard* court found "no question" that the defendant had pursued the attacker "with the intent to capture him, and for no other purpose," pointing out that the defendant did not know the woman who had been attacked nor the attacker, that the defendant had ordered the attacker to stop three or four times, and that there was "no fact even suggesting in the most remote degree any motive on the part of defendant, other than a lawful one of apprehending a felon." (*Id.* at p. 345.)

The Attorney General contends the trial court had no sua sponte duty to instruct the jury that the homicide was justifiable if defendant committed it in an attempt to apprehend a felon "because there was no evidence that he tried to do so." The Attorney General also points out that the trial court did instruct the jury, pursuant to CALCRIM No. 505, that a defendant is entitled, "if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed."

We agree with the Attorney General that no substantial evidence supported the giving of an instruction on justifiable homicide in an attempt to apprehend a felon. Unlike in *Lillard*, neither defendant nor the other Sureños were telling Jacques or Acevedo to stop during the chase. Rather, the group was yelling out gang references and telling Jacques and Acevedo, "Get out of here." Nothing in the record indicates that defendant or the other Sureños intended merely to capture Jacques and Acevedo for purposes of apprehending them. Also in contrast to *Lillard*, here the record provides strong support that defendant had an alternative motive: killing a rival gang member.

The other cases defendant cites are similarly distinguishable. In *People v. Martin* (1985) 168 Cal. App. 3d 1111 (*Martin*), the defendant was an off-duty deputy sheriff who ordered two burglars to stop as they fled from the house next door, then shot and killed the one burglar who continued to flee. (*Id.* at p. 1114.) The appellate court upheld the granting of a section 995 motion dismissing an involuntary murder charge, finding the homicide was justified under section 197, subdivision (4). (*Martin*, *supra*, at p. 1125.) In *People v. Walker* (1973) 32 Cal. App. 3d 897 (*Walker*), the defendant similarly ordered the victim, who appeared to be a fleeing burglar, to stop. (*Id.* at p. 901.) When the victim did not stop fleeing, the defendant shot and killed him. (*Ibid.*) The appellate court reversed the defendant's voluntary manslaughter conviction due to the trial court's failure to instruct the jury on the principles set forth in section 197, subdivision (4). (*Walker*, *supra*, at pp. 905-906.)

In this case, because there was no substantial evidence that defendant attempted to apprehend a fleeing felon, the trial court did not have a sua sponte duty to give an instruction on the principles set forth in section 197, subdivision (4). (*See People v. Zinda* (2015) 233 Cal. App. 4th 871, 879-880 [no evidence the defendant chased and killed the victim in an attempt to arrest the victim].)

*Alaniz*, 2016 WL 5787284, at *9-*10.

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

42

A state trial court's failure or refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

Although Petitioner asserts that the trial court should have provided CALCRIM No. 508, part of this instruction informs the jury that it must find "[t]he defendant committed the [] killing while lawfully trying to arrest or detain [Jacques] for committing (the crime of [a felony that threatened death or great bodily injury], and that crime threatened the defendant or others with death or great bodily injury)." CALCRIM No. 508(1). Here, there was no evidence in the record that Petitioner tried to arrest or detain Jacques. Instead, the evidence overwhelmingly showed that Petitioner and his friends gave chase. On this record, there was no evidence supporting a decision to instruct the jury with CALCRIM No. 508. Similarly, because there was no evidence to support this theory of justifiable homicide, the failure to give this instruction could not have so infected the trial such that Petitioner was deprived of a fair trial.

For these same reasons, Petitioner could not have been prejudiced by counsel's failure to request modification of it, nor was counsel deficient for failing to request it. *See Strickland*, 466 U.S. 694.

Thus, the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 6. "This is for Menace"

Petitioner claims that counsel was ineffective for failing to move to strike prejudicial hearsay testimony when Ramirez testified that after the shooting, Little Grumpy

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

43

stated, "This is for Menace." In addition, Petitioner argues that the failure to strike that

testimony violated his right to confrontation.

The California Court of Appeal rejected this claim.

> As recounted above, Ramirez testified that he and the other VTG gang members ran after the shooting and that he later encountered Savage and Little Grumpy, who at some later point stated, "This is for Menace," which was an apparent reference to the Sureño gang member who had been killed by Norteños a few weeks prior to the McLaughlin Park incident. Defendant's trial counsel did not object or move to strike that testimony.
>
> Ramirez later described getting a ride with Savage and Little Grumpy after the shooting. The prosecutor asked Ramirez, "And when you, Savage, and Little Grumpy get out of the car, what does Little Grumpy say?" Defendant's trial counsel objected: "Calls for hearsay." The trial court sustained the hearsay objection, but the prosecutor argued, "It's not for the truth, but just for that it was said." The trial court responded, "Then I don't think it's relevant." The prosecutor then offered the statement under Evidence Code section 1240 (spontaneous statement), but the trial court observed, "This is quite a while after the incident." After the prosecutor elicited Ramirez's testimony that the statement was made about 10 minutes after the incident, the trial court reiterated that it was sustaining the objection.
>
> Since defendant's trial counsel did not object or move to strike the challenged statement, "This is for Menace," he has forfeited the claim that the trial court erred by admitting that statement. (See People v. Doolin (2009) 45 Cal.4th 390, 448 (Doolin).) We will assume that reasonable trial counsel would have objected, but we find that defendant has not established prejudice as required to succeed on his claim of ineffective assistance of counsel. (See Anderson, supra, 25 Cal.4th at p. 569.) Other evidence suggested that the Jacques shooting was done in retaliation for the shooting of Menace. Huerta had testified that VTG gang member Menace had been shot a few weeks prior to the Jacques shooting, that gang members think about retaliating when a fellow member dies, that the VTG gang had been having meetings about defending themselves and their territory after Menace died, and that defendant was present at the meetings. Moreover, the statement was attributed to Little Grumpy, not defendant, and thus did not constitute direct evidence of defendant's own intent in committing the shooting. On this record, there is no reasonable probability that, had defendant's trial counsel objected and successfully moved to strike the statement, "'"'the result of the proceeding would have been different.'"'" (Ibid.)

Alaniz, 2016 WL 5787284, at *19-*20.

A federal court will not review questions of federal law decided by a state court if

the decision also rests on a state law ground that is independent of the federal question and

adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

44

It is undisputed that Petitioner failed to object to the statement "This is for Menace," the first time the prosecutor elicited the statement, which bars this Court from reviewing Petitioner's claim that the admission of this testimony violated the Confrontation Clause.

The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (holding petitioner barred from challenging admission of evidence for failure to object at trial). This claim is procedurally defaulted, and unless Petitioner shows cause and prejudice or a miscarriage of justice, *see Coleman*, 501 U.S. at 750, it is barred.

A petitioner can show cause by presenting an ineffective assistance of counsel claim in the state courts, which Petitioner attempts to do here. While a petitioner may show cause by establishing constitutionally ineffective assistance of counsel, attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991). To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). That is, unless Petitioner can show that counsel was ineffective, his Confrontation Clause claim is barred.

Here, Petitioner has not demonstrated that the failure to move to strike the statement, "This is for Menace," prejudiced the defense. As the California Court of Appeal noted, other evidence was presented suggesting that the shooting was done in retaliation for Menace's death that occurred a few weeks prior to this incident. Huerta also testified that Sureños think about retaliation when one of their gang members dies, and in

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

45

fact, the VTG had several meetings which Petitioner attended in which they discussed defending themselves and their territory after Menace died. In addition, the statement was attributed to Little Grumpy, and provided no more than Little Grumpy's motivation or state of mind after the shooting. It did not provide direct evidence of Petitioner's state of mind when he shot Jacques.

On these grounds, the Court cannot say that the failure to move to strike this statement prejudiced the defense. Because there was no prejudice, Petitioner has failed to show cause and prejudice and his Confrontation Clause claim is barred from federal review. Finally, based on the lack of prejudice, Petitioner's stand alone ineffective assistance claim must fail because the state court's rejection of it was not contrary to, or an unreasonable application of, *Strickland*.

### 7. Admission of "irrelevant guns"

Petitioner claims that the trial court improperly admitted evidence of "other crimes" because it was highly prejudicial. Specifically, the jury was permitted to learn that Petitioner sought to replace the gun that he used to kill Jacques, and had possessed another firearm in an unrelated police stop. To the extent the state court concluded that counsel failed to object to the evidence, Petitioner argues that counsel was ineffective for failing to do so.

The California Court of Appeal addressed and rejected this claim. It concluded that Petitioner forfeited a portion of the claim by failing to object to the admission of the evidence regarding the replacement gun, and that the admission of evidence regarding Petitioner's prior gun possession for an unrelated incident in 2012 was proper. *Alaniz*, 2016 WL 5787284, at *20.

Even assuming the claim is not procedurally barred, the admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial

1 guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).

2 The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

3 prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

4 the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial

5 court's admission of irrelevant pornographic materials was "fundamentally unfair" under

6 Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly

7 established Supreme Court precedent under § 2254(d)); *see, e,g,*, *Zapien v. Martel*, 849

8 F.3d 787, 794 (9th Cir. 2016) (because there is no Supreme Court case establishing the

9 fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such

10 claim on federal habeas review).

11 Thus, the state court's rejection of Petitioner's claim that admission of irrelevant

12 "other crimes" violated his right to due process is not contrary to, or an unreasonable

13 application of, clearly established Supreme Court law.

14 Petitioner fares no better with his related ineffective assistance of counsel claim.

15 With respect to the admission of evidence regarding the 2012 police stop wherein

16 Petitioner had been pat-searched and officers believed Petitioner possessed a gun, the

17 California Court of Appeal found the admission proper. Thus, counsel could not have

18 been ineffective for failing to object to it.

19 With respect to the admission of evidence that Huerta testified that Petitioner had

20 obtained a new gun after destroying the one used to kill Jacques, Petitioner also cannot

21 demonstrate prejudice. The evidence was cumulative to other admitted evidence showing

22 that Petitioner possessed guns as the "gun holder," for the benefit of the gang. Dkt. Nos.

23 18-14 at 159, and 18-15 at 46-47. The evidence of Petitioner's gun possession was

24 relevant to prove the substantive gang charge as well as the gang enhancement. In

25 addition, as stated previously, the gang conviction was stayed and the gang enhancement

26 was dismissed. Thus, Petitioner cannot show that he was prejudiced by this admission.

27 Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
28 APPEALABILITY; DIRECTIONS TO CLERK

47

Thus, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

### 8. Insufficient evidence of premeditation, deliberation, and malice

Petitioner claims there was insufficient evidence of premeditation and deliberation. Specifically, Petitioner argues that the jury could not have found that Petitioner formed the necessary state of mind in the "fifteen seconds" during which Petitioner was chasing Jacques and Acevedo. Petitioner also alleges that there was insufficient evidence of malice, or the absence of an honest belief in the need to defend and the absence of heat of passion or sudden quarrel.

The California Court of Appeal rejected Petitioner's claim.

**2. Premeditation and Deliberation**

"'"Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] '"Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" [Citation.]' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).)

"*People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) discusses three types of evidence commonly shown in cases of premeditated murder: [1] planning activity, [2] preexisting motive, and [3] manner of killing. [Citation.]" (*Solomon, supra*, 49 Cal.4th at p. 812.) However, "'*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' [Citations.]" (*Ibid.*)

A jury's finding of premeditation and deliberation was upheld in *Villegas, supra*, 92 Cal. App. 4th 1217, which involved facts similar to those in the present case. In *Villegas*, the victim and the defendant were members of rival gangs, and they had both been involved in a gang altercation a few months before the charged incident, during which the victim had struck defendant's friend. (*Id.* at p. 1222.) When the victim and defendant saw each other again outside a motel, the defendant threw a gang sign and stated the name of his gang before shooting at the victim at least six times. (*Ibid.*) Several of the shots were fired at the driver's side door and window of the truck the victim was driving. (*Id.* at p. 1224.) The defendant was convicted of attempted first degree murder. (*Id.* at p. 1221.)

On appeal, the *Villegas* court rejected the defendant's claim that the evidence was insufficient to support findings of premeditation and deliberation. The court noted that the defendant "need not have planned to kill [the victim] before he saw him on the day of the incident," and that "prior planning activity" was shown by the fact

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

48

that the defendant was carrying a loaded gun. (*Villegas*, *supra*, 92 Cal. App. 4th at p. 1224.) Moreover, the jury could have found that the defendant "thought before he acted," since upon recognizing the victim and before shooting at him, the defendant had thrown a gang sign and yelled the name of his gang. (*Ibid.*) There was also evidence of motive, in that the defendant and victim were members of rival gangs, the shooting would benefit the defendant's gang, and the shooting was in retaliation for the prior incident. (*Ibid.*) The manner of shooting – at least six shots, which were fired from about 25 feet away and "directed at the occupants of the truck" – also supported a finding of premeditation. (*Ibid.*)

In the present case, defendant's act of carrying a loaded firearm likewise constituted "prior planning activity," particularly in light of the evidence showing that he was entrusted with the gun by other gang members who had been meeting to discuss retaliation for the shooting of Menace. (*See Villegas*, *supra*, 92 Cal. App. 4th at p. 1224.) The opportunity for such retaliation also provided evidence of defendant's motive for the shooting, since there was evidence that defendant knew Jacques was a Norteño gang member or associate, including his statements to Castillo and the fact that gang slogans were yelled by the Sureños chasing Jacques and Acevedo. And the manner of killing showed "a clear intent to kill." (*Ibid.*) Defendant fired three shots at Jacques, including one that hit Jacques in the chest and one that hit him in the thigh. He fired from 20 to 23 feet away, with several seconds in between the first shot and the second shot. The evidence strongly suggested that the first shot hit Jacques in the leg and that despite injuring Jacques with that shot, defendant fired two more shots at him. On this record, a reasonable trier of fact could find, beyond a reasonable doubt, that defendant premeditated and deliberated before the shooting. (*See Johnson*, *supra*, 26 Cal.3d at p. 578.)

### 3. Malice

Defendant argues that there was insufficient evidence of malice because the prosecution failed to prove the absence of (1) an honest belief in the need to defend himself and others and (2) heat of passion or sudden quarrel. (*See People v. Rios* (2000) 23 Cal.4th 450, 460 [a defendant lacks malice if he or she acts in a sudden quarrel or heat of passion or with an unreasonable but good faith belief in having to act in self-defense].)

Defendant first argues that the evidence showed he shot Jacques with a subjective belief in the need to defend Valdez against the initial attack, and with a subjective belief in the need to defend himself and the other Sureño gang members against the renewed threat posed when Jacques and Acevedo stopped fleeing and raised their weapons. While the jury may have been able to make such a finding on this record, such a finding was not compelled by a matter of law. Reviewing the entire record "in the light most favorable to the judgment below" (*Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude that a reasonable jury could have found defendant did not subjectively believe he needed to defend himself or others. When describing the incident to Huerta and Castillo, defendant indicated he committed the shooting for gang-related reasons, not because he believed he needed to defend himself or others from imminent peril. Thus, there was substantial evidence to support a finding that defendant did not shoot Jacques in the honest but unreasonable belief in the need for self-defense or defense of others.

Defendant next argues that the evidence showed he shot Jacques during a sudden

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

49

quarrel or in a heat of passion. However, the evidence does not compel a finding that defendant's "'reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.'"' [Citation.]" (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) A reasonable jury could have found, on this record, that Jacques did not act in a manner that constituted sufficient provocation when he turned around after initially fleeing from the chasing Sureños. A reasonable jury could also have found that defendant's reason was not obscured by passion, but that he committed the shooting for gang-related reasons including retaliation for the shooting of Menace. Thus, there was substantial evidence to support a finding that defendant did not shoot Jacques during a sudden quarrel or in a heat of passion.

*Alaniz*, 2016 WL 5787284, at \*22-\*23.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief. *See Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979). The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324. The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is, rather, to decide whether the state court unreasonably applied the *Jackson* test. *See Sarausad v. Porter*, 479 F.3d 671, 678, 683 (9th Cir. 2007).

Regarding premeditation and deliberation, California case law has held that "premeditation and deliberation can occur in a brief interval. The test is not time, but reflection." *People v. Solomon*, 49 Cal.4th 792, 812 (2010). Here, the evidence shows that Petitioner had thought about retaliation against Norteños for the death of Menace, and generally had negative thoughts of Norteños. In addition, that Petitioner was the "gun

Case No. 17-03569 BLF (PR)
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

50

holder" and carried a loaded firearm shows "prior planning activity." The evidence also showed that Petitioner shot at Jacques from a distance of approximately 20-25 feet away, and that after the first shot, which appeared to hit Jacques' leg, once Jacques began to get up, Petitioner fired again, shooting Jacques in the chest and killing him. Based on the record, there was sufficient evidence of planning activity, motive, and the manner of killing, *see People v. Anderson*, 70 Cal.2d 15, 26-27 (1968), such that the California Court of Appeal's conclusion that there was sufficient evidence of premeditation and deliberation was not an unreasonable application of *Jackson*.

Regarding malice, while the jury could have inferred that Petitioner had a subjective belief in the need to defend himself or others, it did not. The evidence was not such that the jury could not have believed that Petitioner harbored the requisite intent to kill. At trial, Huerta and Castillo testified that Petitioner admitted shooting and killing Jacques, but did not suggest that the shooting was in defense of himself or others. Rather, Huerta and Castillo believed that the shooting was for gang-related reasons. In addition, the evidence was sufficient to show that Petitioner intentionally and deliberately killed Jacques. A jury could find that Jacques' turning around to help Acevedo was not sufficient provocation to warrant Petitioner's shooting at him from 20-25 feet away, and then shooting at Jacques again five seconds later as Jacques was attempting to get up.

Based on this record, the California Court of Appeal's conclusion that there was sufficient evidence of malice was not an unreasonable application of *Jackson*.

## 9. Cumulative error

Petitioner claims that the cumulative effect of the errors prejudiced him. The California Court of Appeal found the following instances of error and assumed error, and concluded that they were harmless: (1) prosecutorial misconduct regarding the prosecutor's misstatement that deliberation did not require a conscious weighing of options; (2) a Confrontation Clause error regarding the gang expert's testimonial hearsay;

1     (3) the trial court's failure to modify CALCRIM No. 336 regarding clarification that an in-

2     custody informant's testimony need not be corroborated if it favors the defense; and (4)

3     prosecutorial misconduct insinuating that there were potential witnesses who were afraid

4     to testify.

5         As stated previously, in some cases, although no single trial error is sufficiently

6     prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a

7     defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334

8     F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors

9     hindered defendant's efforts to challenge every important element of proof offered by

10    prosecution).  The cumulative effect of more than one error can violate due process when

11    they "they amplify each other in relation to a key contested issue in the case." *Ybarra v.*

12    *McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2001).

13        These four errors did not amplify each other in relation to a key contested issue.

14    One, the misstatement regarding deliberation was directly relevant (but harmless by itself)

15    to the contested issue of whether Petitioner deliberately killed Jacques.  Two, Detective

16    Rak's testimony was cumulative to other evidence showing that Petitioner's motive was

17    gang-related.  Three, the failure to clarify CALCRIM No. 336 had no prejudicial effect

18    because evidence corroborated Castillo's testimony such that the jury was not precluded

19    from considering it.  And, four, the comment regarding fearful witnesses, as stated

20    previously, did not have a real impact on the issue of whether Petitioner was guilty of first

21    degree murder.  In sum, these errors did not share a "unique symmetry" and together, were

22    not directly related to a key contested issue at trial.  *See Parle v. Runnels*, 505 F.3d 922,

23    932-33 (9th Cir. 2007).

24        Thus, the California Court of Appeal's conclusion that the cumulative effect of

25    these errors were not prejudicial was not contrary to, or an unreasonable application of,

26    clearly established Supreme Court law.

27    Case No. 17-03569 BLF (PR)
      ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
28    APPEALABILITY; DIRECTIONS TO CLERK

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the petition for a writ of habeas corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: October 4, 2018

BETH LABSON FREEMAN
United States pDistrict Judge